**Marcia TOMSON, Plaintiff,**

v.

**Robert T. STEPHAN and Bob W. Storey, Defendants.**

Civ. A. No. 85–4485–S.

United States District Court, D. Kansas.

Oct. 21, 1988.

Fred D. Thompson, Richard J. Braun, Thompson & Bussart, Nashville, Tenn., Don C. Krueger, Emporia, Kan., for plaintiff.

Carl A. Gallagher, Asst. Atty. Gen., Martha A. Peterson, Deanne Watts Hay, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan., Gerald L. Michaud, Michaud & Hutton, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' motions for reconsideration. On September 19, 1988, this court issued a Memorandum and Order denying defendants' motions for summary judgment, 696 F.Supp. 1407. Defendants timely filed the present motions seeking reconsideration of that part of the Memorandum and Order addressing the false light publicity claim.

The facts giving rise to this lawsuit are set out in detail in this Court's September 19, 1988 Memorandum and Order; therefore, the court need not elaborate on them here. Simply stated, this case arises out of the settlement of a sexual harassment case brought by plaintiff Marcia Tomson ("Tomson") against her former employer, who is the Kansas Attorney General, and his close associate. At a news conference after the case was settled, defendants revealed the terms of the settlement and stated that the original suit was "without merit" and "totally unfounded." Plaintiff then brought this suit against defendant Robert T. Stephan ("Stephan") for breach of an alleged confidentiality term in the settlement agreement. She sued Stephan and his associate, Bob W. Storey ("Storey"), for false light publicity.

Defendants ask for reconsideration of this court's determination that their statements at the press conference were not opinion and were therefore actionable. They also seek reconsideration of this court's finding that plaintiff was not a "limited public figure" and not required to show malice. Finally, they claim that Kansas law requires a showing of two types of malice, regardless of plaintiff's status as a public or private figure: they argue she must show "knowledge or reckless disregard" of the falsity of the publicized matter as an element of her claim, and she must show "actual evil-mindedness or intent to injure." The court will address each of these arguments accordingly.

■ Defendants still argue that their statements at the press conference concerning the merits of plaintiff's sexual harassment case were merely statements of opinion and therefore not actionable. Storey first argues that the court erred in concluding that Storey was a "close advisor" of Stephan's and that this alleged fact was revealed at the press conference. In its September 19, 1988 Memorandum and Order, this court held that under all the circumstances, including the fact that Storey was not an objective third party analyzing the legal merits of the sexual harassment case, but instead a "close advisor" of Stephan's, the statements he made must be interpreted as assertions of fact instead of opinion. *See* Memorandum and Order, at 1412. Storey contends that his "close advisor" status was not revealed at the press conference, and therefore his statements could not be interpreted as an assertion of fact.

This argument is without merit. Storey stated at the press conference that he had assisted with the settlement of the case and was intimately acquainted with those proceedings. It is reasonable to assume that one claiming to have personal knowledge of the facts giving rise to the case, or at least to have closely advised the defendant in the case, would be asserting as fact that the case was "without merit." Storey's argument is rejected.

Both defendants next cite several circuit court cases in support of their argument that their statements were only opinion.

Their primary reliance is upon *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir.1980). In that case, defendant had issued a statement during the course of litigation with the plaintiff regarding its opinion on the merits of the lawsuit. The defendant stated several times that in its opinion, the suit was without merit. The court analyzed three relevant factors, including 1) whether the words could be understood in a defamatory sense, 2) whether the statements were made under circumstances in which sharp rhetoric might be expected, such as a public debate or heated labor dispute, and 3) whether cautionary language was used. *Id.* at 784. The court concluded that the statement was one of opinion. The statement was made in a trade journal within an article concerning the suit. It was made in the early weeks of the litigation. Finally, it was prefaced with cautionary language indicating the statement was one of opinion. Thus, all three relevant facts indicated the statement was one of opinion.

In contrast, defendants here made their statements at a press conference supposedly called to finally tell the press and the people of Kansas "the truth" about the prior lawsuit. The statements were not simply requested as part of a larger report on an ongoing suit; instead, the statements were made on Stephan's own initiative after the litigation had already been resolved. While those reading a statement by *Genesis One Computer Corp.* concerning the relative merits of an ongoing lawsuit might expect that Genesis would deny the allegations and would even employ rhetoric and hyperbole, the same would not be expected of Stephan and Storey after the sexual harassment case was settled. There was no ongoing controversy between plaintiff and Stephan anymore, and no reason to issue the kind of statement issued by the defendant in *Information Control Corp.* In fact, it is reasonable to assume that after months of pressure from the press and public, Stephan would call this news conference to tell the truth. Finally, the defendant in *Information Control Corp.* had prefaced its statement with cautionary language, while Stephan and Storey employed no such language when speaking of the merits of Tomson's suit. *Information Control Corp.* is patently distinguishable, and defendants' argument is rejected.

Defendants also cite *Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir.1983), as further authority, but *Rinsley* actually lends support to plaintiff's case. The defendant in *Rinsley* had published a book about psychiatric treatment, including that employed by plaintiff in his professional practice. The court examined the statements in the context given, and concluded they were merely statements of opinion. Likewise, the court has examined Stephan and Storey's statements in the context in which they were made: after litigation was resolved, as part of a news conference called after months of speculation and calls to the Attorney General to "come clean," and from the party having personal knowledge of the circumstances giving rise to the original suit and one of his advisors in the settlement of that suit. After this analysis, the court has concluded that the statements were assertions of fact. Indeed, the court in *Rinsley* pointed out that even if a statement might be interpreted as one of opinion, it may be actionable if it implies an allegation of undisclosed false facts as the basis for that opinion. *Id.* at 1309; *see also* Restatement (Second) of Torts § 566 (1977). Stephan and Storey's statements of "opinion" that Tomson's case was "without merit" and "totally unfounded" implied a knowledge of the underlying facts giving rise to the suit. And those underlying facts indicated to the listener that Tomson's charges of sexual harassment were untrue.

Again, in the case *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.1986), a circuit court of appeals required that a district court examine all surrounding circumstances in determining whether a statement is one of opinion or fact. *Id.* at 1302. In that case, the Eighth Circuit examined four factors set out by the D.C. Circuit in *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Those factors are: 1) the precision or specificity

of the statement in question, 2) the verifiability of the statement, 3) the literary context in which the statement is made, and 4) the public context in which the statement is made. *Janklow*, 788 F.2d at 1302. The statements at issue in *Janklow* concerned the alleged improper motives of a state prosecutor in pursuing a criminal complaint against one who had previously accused him in a tribal court of rape. The court noted in particular that the truth of the statement was not verifiable, since motivation is highly subjective and solely within the mind of the actor. The court also noted that Newsweek, Inc. was the publisher of a weekly newsmagazine, that the statements in question had appeared in that magazine, and that the average reader expects a subjective slant to most stories appearing in such a publication. Finally, the court noted that the public context in which the statement was made was highly relevant, and cautioned against holding the speaker liable in such a context. Of extreme importance was the statement by Judge Bork in the *Ollman* case that courts should proceed with extreme caution when a statement implicates the core values of the first amendment; the statement at issue in *Janklow* addressed the conduct of a public official while in office. *See Ollman,* 750 F.2d at 995 (Bork, J., concurring).

This court has no trouble distinguishing the character of Stephan and Storey's statements from those made in *Janklow*. Stephan and Storey asserted that Tomson's suit was unfounded and without merit; this does not address subjective motives, but instead addresses the facts surrounding Stephan's alleged sexual advances towards Tomson. The statements were not made in a magazine expected to have an editorial slant; they were made by the Attorney General of the State of Kansas and his advisor after months of pressure to "tell the truth." Finally, defendants' statements do not implicate the core values of the first amendment. They are not statements *about* public officials, they are statements *by* public officials regarding a private citizen. The court rejects defendants' arguments.

■ Closely related to this opinion argument is defendants' contention that the Kansas Constitution affords all citizens the right to comment upon matters of public interest. Kansas Bill of Rights § 11. Defendants further cite the case *Coleman v. MacLennan*, 78 Kan. 711, 98 P. 281 (1908), in support of this contention. The court of course agrees that every citizen has the right to speak out about candidates for public office and other matters of public concern. But the court finds no authority in the Kansas Constitution or in the case law for defendants' converse proposition that a candidate for public office and/or a public official may disparage a private individual in the press without consequence. The court will not expand the privileges of defamation and invasion of privacy law to this extreme, and defendants' arguments are rejected.

■ Defendants also contend that their statements constituted "self-defense," and are therefore privileged. Since this argument was not addressed in defendants' original motions for summary judgment, they are not properly raised here. However, even if the self-defense argument were properly raised, it would be without merit. The principle is stated in section 594 of the Second Restatement of Torts:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> (a) there is information that affects a sufficiently important interest of the publisher, and
>
> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

Defendants cite Comment k to section 594 in support of their argument that their statements were conditionally privileged as self-defense:

> A conditional privilege exists under the rule ... when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself.... Thus

the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar.

Section 594, therefore, requires that the speaker "reasonably believ[e] that his interest in his own reputation has been unlawfully invaded." Stephan's reputation of course would not have been "unlawfully invaded" if in fact Tomson's allegations in her sexual harassment suit were true, and he would not be reasonable in believing Tomson's actions were "unlawful." The resolution of this question is inherently improper for the court in the context of a summary judgment motion, and defendants' contentions are again denied.

■ Defendants next argue that the court was incorrect in finding that plaintiff was not a limited public figure. They cite several cases, all of which are clearly distinguishable.

The plaintiff in *Street v. National Broadcasting Co.*, 645 F.2d 1227 (6th Cir. 1981), had been the complaining witness against nine black youths in an infamous rape trial in the South in the 1930's. Defendant broadcasted a movie based on the events, and plaintiff brought suit for libel and invasion of privacy. The court held that plaintiff was a limited public figure and was therefore required to show malice. The court followed the analysis set out in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The first step in that analysis is to determine whether a "public controversy" existed. The second step is to determine "the nature and extent of [the] individual's participation" in the public controversy. *Id.* at 352, 94 S.Ct. at 3013; *see Street*, 645 F.2d at 1234. *Gertz* set out three factors for determining the "nature and extent" of the individual's participation in the controversy: 1) whether the individual's involvement was voluntary, 2) whether and to what extent the individual had access to channels of effective communication to counter false statements, and 3) the individual's prom-

inence in the controversy. *Gertz*, 418 U.S. at 344–45, 94 S.Ct. at 3009–10; *see Street*, 645 F.2d at 1234.

The sixth circuit noted that while not all judicial proceedings constituted "public controversies," the rape trials in question were a public controversy. The court noted that the trials:

were the focus of major public debate over the ability of our courts to render even-handed justice. [They] generated widespread press and attracted public attention for several years. [They were] also a contributing factor in changing public attitudes about the right of black citizens to equal treatment under the law and in changing constitutional principles governing the right to counsel and the exclusion of blacks from the jury.

In fact, the United States Supreme Court twice reviewed the defendants' case. The Court held that in their first trial, the defendants had been denied the right to counsel as guaranteed by the sixth amendment; *see Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). It then reversed a second guilty verdict because blacks were systematically excluded from grand and petit juries. *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *Patterson v. Alabama*, 294 U.S. 600, 55 S.Ct. 575, 79 L.Ed. 1082 (1935); *see Street*, 645 F.2d at 1230. Further, during the on-going court proceedings, the press wrote about the plaintiff, and she gave several interviews to the press. *Street*, 645 F.2d at 1230.

The court had no trouble concluding that the proceedings did constitute a "public controversy." Further, the court determined that plaintiff had played a prominent role in the controversy by virtue of her role as sole prosecutrix in the case. She had adequate access to channels of effective communication, because the press presented her with many opportunities to be interviewed and she was in fact interviewed on several occasions. She "aggressively promoted her version of the case" outside the court proceedings. *Id.* at 1235. Her willingness to be interviewed was also a determining factor in the court's conclusion that

her involvement in the controversy was voluntary. *Id.* at 1234–35.

Unlike the notorious rape trial in Alabama in the 1930's that led to some landmark decisions from the Supreme Court on equal protection in the criminal justice system, Tomson's sexual harassment case did not constitute a "public controversy." As this court stated in its September 19, 1988, Memorandum and Order, this was merely a private civil lawsuit filed by a woman against her employer for employment discrimination. Her employer happened to be the state attorney general. In one sense, the public does have an interest in everything involving its elected officials, including private employment discrimination lawsuits filed against those officials by members of their clerical staffs. However, this interest does not convert every plaintiff in such a case into a limited public figure. As the Court stated in *Street*, "[n]ot all judicial proceedings are public controversies." *Id.* While defendants might wish to draw some parallels between the heavy publicity this case has drawn and the publicity the rape trials at issue in *Street* drew, the amount of publicity a case receives is simply not determinative; *see, e.g., Time, Inc. v. Firestone*, 424 U.S. 448, 455, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). The court will not be swayed by the fact that the press might have chosen to sensationalize the fact that Tomson's discrimination suit charged Stephan with making improper sexual advances. This is especially so when Tomson so adamantly shunned the press during the pendency of her action and afterward.*

Defendants also cite *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir.1985), as authority for their proposition that private individuals need not voluntarily thrust themselves into public controversy in order to become limited public figures. The individual in that case had been an air traffic controller on duty at the time of the tragic crash of a commercial aircraft. Many lives were lost in the crash, the National Transportation Safety Board

("NTSB") conducted a public investigation into the crash, and a Federal Aviation Administration ("FAA") program came into issue during that investigation. The plaintiff appeared at several NTSB hearings on the crash. An article was later published in *The Washingtonian* which pinned part of the blame on Dameron, and he sued for defamation.

The court in *Dameron* had no trouble concluding the case constituted a "public controversy." It cited the fact that the crash involved a public carrier, the NTSB held public hearings, and questions were raised concerning an FAA program. The court then moved on to an analysis of whether despite the fact that Dameron had not voluntarily injected himself into the controversy, he could still be considered a limited public figure. The court noted that the cases in which a private individual will involuntarily become a public figure are "exceedingly rare." *Dameron*, 779 F.2d at 741 (citing *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009). The court concluded that despite the fact Dameron took no purposeful action to inject himself into the controversy, he was indeed at the middle of a controversy of intense interest to the general public. The court therefore concluded he was a public figure. *Dameron*, 779 F.2d at 742. However, the court emphasized the limited scope of its holding, and noted that "[t]he circumstances in which an involuntary public figure is created will ... continue to be few and far between." *Id.*

In light of this limiting language, *Dameron* is of little precedential value. The facts here are so dissimilar to those in *Dameron* that the court cannot utilize *Dameron* as a basis for a conclusion that Tomson became an involuntary public figure. As stated before, her initial lawsuit was essentially a private employment discrimination suit. Because of the sensational charges she made concerning alleged sexual advances, the press took keen interest in the case. But the suit was hardly

---

* While defendants place great emphasis on the fact that Tomson did make one statement to the press which only resulted in stirring up more controversy, this fact is not significant enough

to be controlling, especially in light of the fact that her statement was made only at the urging of the attorney general.

the type of controversy in which the public had a strong vested interest, like the crash of a public carrier at our nation's capitol and a review of an FAA program. It is true that there was some preliminary speculation that the Kansas Legislature should conduct an inquiry into the settlement, but no inquiry was instigated, and the speculation took place primarily among legislators and the press. The facts here simply are not persuasive enough for the court to rule this is one of those "exceedingly rare" situations in which a private figure involuntarily becomes a public figure. *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009.

The court takes note of the third authority cited by defendants, but we highlight it more for its insightful language than its precedential value. The district court in *Rosanova v. Playboy Enterprises, Inc.,* 411 F.Supp. 440 (S.D.Ga.1976), observed that "[d]efining public figures is much like trying to nail a jellyfish to the wall." When the case went up on appeal, the circuit court looked to the words of Justice Potter Stewart in remarking that "[a]lthough the public figure concept has eluded a truly working definition (footnote omitted), it falls within that class of legal abstractions where 'I know it when I see it.'" *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir.1978) (quoting *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring)). The plaintiff in *Rosanova* did not even argue he was not a public figure; he only argued that he should not have become one. *Rosanova,* 580 F.2d at 861. *Rosanova* does not support defendants' argument; the court rejects their contentions, and it sympathizes with the views of the Georgia court and the fifth circuit.

■ Defendants also contend that plaintiff must show they acted with malice, regardless of her status as a public or private figure. Section 652E of the Second Restatement of Torts provides that one of the elements of false light publicity is that the defendant had knowledge of the falsity of his statement or reckless disregard for whether the statement was true. Section

652E has been adopted by the Kansas courts. *Rinsley v. Frydman,* 221 Kan. 297, 303, 559 P.2d 334, 339 (1977) (recognizing tentative draft of Restatement (Second) of Torts § 652E); *see also Rinsley v. Brandt,* 700 F.2d 1304, 1307 n. 3 (10th Cir.1983) (recognizing that Kansas Supreme Court would accept the final draft of the Restatement (Second) of Torts § 652E, adopted in 1977). Of course it is absurd for Stephan to allege there could be no evidence of his knowledge or reckless disregard of the truth or falsity of his statements; he and Tomson know better than anyone else whether he sexually harassed her. Further, a jury could reasonably conclude that Storey knew his statements at the press conference were false or at least that he acted with reckless disregard for whether they were true. He was a close advisor to Stephan and assisted in the settlement of the first case. A jury might find that he was aware of the merits of Tomson's claim; a jury might also conclude he was reckless in stating the suit was meritless despite his close access to Stephan and to the truth. Determination of these issues is improper at the summary judgment level, and sufficient facts exist to leave it in the hands of the jury.

Finally, defendants contend that plaintiff must show "actual evil-mindedness or intent to injure" in order to establish her claim of false light publicity. Defendants' contention is incorrect. Kansas law only imposes this additional burden when the statements are protected by a qualified privilege, *Munsell v. Ideal Food Stores,* 208 Kan. 909, 920–21, 494 P.2d 1063, 1073 (1972). Since the court has not determined that any statements were conditionally privileged, the court cannot grant summary judgment on this final contention.

As a footnote, the court denies defendants' request for clarification of its September 19, 1988, Memorandum and Order, to the extent this court made a determination on plaintiff's status as a private figure. Defendants ask the court to clarify its order by stating it did not determine as a matter of law that plaintiff was a private figure, but instead only decided that it was improper to enter summary judgment and

determine that she was a public figure as a matter of law. It is purely a matter for the court to determine whether plaintiff is a public or private figure. *Dameron*, 779 F.2d at 740; *Marcone v. Penthouse Int'l*, 754 F.2d 1072, 1081, n. 4 (3d Cir.1985); *Fitzgerald v. Penthouse Int'l*, 691 F.2d 666, 669 (4th Cir.1982); *Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 379 (1981). Contrary to defendants' contentions, the court's previous determination that Tomson was not a public figure did not rest solely on the question of whether she voluntarily issued a statement to the press in support of Stephan after the first case was settled. All the circumstances establish plaintiff was a private figure, and the case will be submitted to the jury on that theory.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motions for reconsideration are denied.